UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:12CR100HEA(MLM) |
| ) | |
| GREGORY MICHAEL CROMER, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the court on Defendant's Motion to Suppress Evidence. [Doc. 21] The government responded. [Doc. 24] In lieu of an Evidentiary Hearing, the parties submitted a Stipulated Set of Facts Pertinent to Defendant's Motion to Suppress. [Doc. 26] For the convenience of the court, these stipulated facts are set out verbatim.[1]

**STIPULATED FACTS**

On January 8, 2009, sometime before 4:00 a.m., a fire ignited at 8207 Highway 47 in Saint Clair, Missouri, in Franklin County. The location contained an office building owned by "Cromer Motors," doing business as (d.b.a) "Sundowner of Missouri"; an attached auction barn; and approximately twenty (20) fifth-wheel horse trailers. Defendant Gregory Cromer is the sole owner and operator of Cromer Motors, but defendant also leases office space within the building to several other businesses. (See Exhibits A and B attached hereto and incorporated herein.)

Sundowner Trailers sells large combination animal and living quarter trailers. (See Exhibits C – H, attached hereto and incorporated herein.) The trailers located on the premises during the time of the fire were owned by Cromer Motors and financed at G.E. Credit, and each

---

[1] Exhibits A-H are attached to the Stipulation (Doc. 26). They will be provided to the district court in paper form at the time of filing this Report and Recommendation.

contained an area designed for transporting animals and separate residential quarters. The adjoining auction barn is also owned by defendant but is leased and occupied by "Saint Clair Livestock Auction," an auction business and facility for large farm animals (cattle, horses and goats). The realty owned by defendant at 8207 Highway 47, including the trailers, is enclosed by a welded wire fence topped with barbed wire, and there is a padlocked metal gate leading from Highway 47 to the building via a gravel road.

At the time of the fire the building was closed up and locked. The gate was closed and locked. The trailers were closed and locked, and their keys were locked up inside the building in a lockable key closet within the sales office area in the northeast corner of the building. The realty and building comprised commercial premises where defendant sold cars and trailers, and where his tenants also sold cars and operated a livestock auction. The building itself is divided into three (3) searched areas: (1) the rental offices in the southeast corner of the building; (2) the livestock auction barn in the western portion of the building; and, (3) the sales office area in northeast corner. The tenants of the livestock auction and rental office areas had keys to their own rented premises, but did not have keys or interior access to the portions of the building other than their own rented areas. Gregory Cromer and his employees, Doug Thompson and Andrew Bird had keys to all three searched areas of the building. Cromer, Bird, Thompson and all tenants had keys to the entry gate. First responders to the scene of the fire at 8207 Highway 47 included the Saint Clair Fire Protection District (SCFD), Washington Fire Department (WFD), Union Fire Department (UFD), and the Pacific Fire Protection District (FD). When SCFD arrived at 8207 Highway 47 at approximately 4:00 a.m., the perimeter gate from Highway 47 to the business grounds was locked and secured, as well as the man-doors to the business offices and attached auction barn structure. First responders made a warrantless entry through the gate and into the building, and proceeded to extinguish fire.

The fire had been extinguished and the property had been secured by fire department and local law enforcement personnel shortly before 8:00 a.m. on January 8, 2009, at which time SCFD and the Franklin County Prosecuting Attorney's Office (FCPAO) requested the assistance of Special Agent/Certified Fire Investigators (SA/CFI) from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) in determining the origin and cause of the fires. The building's electric and gas service had been shut off by Ameren/UE and the MFA Propane Company respectively, at the request of fire personnel. Two ATF Special Agent CFI's, several ATF Special Agents, investigators from the Missouri State Fire Marshal's Office and a member of the St. Louis County Bomb & Arson Squad (with K-9 partner "Chloe") responded to assist in the investigation.

At approximately 11:00 a.m. the fire scene examination commenced. Without a warrant and without consent of defendant, law enforcement agents and officers entered onto and into defendant's realty and building. In the building they searched the offices and the livestock area. In the office area they obtained keys to unlock the trailers. The agents and officers used the keys to open the locked trailers, and then entered each of the trailers.

Agents began at the office building, where the exterior doors had been opened to aid in smoke and odor evacuation. Inspection revealed the office areas sustained little to no damage. Agents then inspected the barn, which sustained significant fire damage. From that inspection, determination was made that there were two separate points of fire origin. Agents last examined six combination animal/living quarter trailers, each of which showed signs of vandalism and break-in. Officers and agents will testify that three of the trailers contained separate areas of fire origin in the form of burnt newsprint, and the other three trailers contained newsprint showing no fire damage. Officers and agents would further testify that 2 of the six trailers had liquid with the odor of inflammable fluid splashed throughout the residential quarters, and that the residential

quarters of each trailer contained a one-gallon jug approximately two-thirds full of an unknown yellow liquid.

Officers and agents would testify that inside the building and residential areas of the trailers, they found, seized and photographed inflammable liquids and ignition devices, including the burned and unburned newspaper; that they found, photographed and seized a spot of blood on the exterior of one of the trailers, which was later "DNA-matched" to defendant; that inside the building they found and photographed various electric panels, wiring and devices as well as propane tanks, lines, valves and devices which can sometimes be the source of non-incendiary fire; and that inside they building they found and seized several samples of carpet and business receipts alerted to by K9 "Chloe," additionally seizing samples of carpet from underneath the receipts.

The government's opinion witnesses concluded the fires and allegedly attempted fires were incendiary in origin, and that they were set or attempted to be set by someone using the inflammable liquids and newspapers as accelerants and ignition devices. The government's witnesses will further opine that, based at least in part upon defendant's seized business records, defendant was then in difficult financial circumstances, such that defendant had a pecuniary motive to burn or try to burn his own buildings and trailers.

There were no fatalities or injures associated with this fire.

## **CONCLUSIONS OF LAW**

It is undisputed that the Fourth Amendment is "subject only to a few specifically established and well delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967). One of these exceptions - - long recognized - - is the investigation of the origin of a fire.

Michigan v. Tyler, 436 U.S. 499, 510 (1942).  "A burning building clearly presents an exigency of sufficient proportions to render a warrantless entry 'reasonable.'"  Id. at 509.  In addition, the exigency justifying a warrantless entry to fight a fire does not end with the dousing of the last flame. Id. at 510.

> Fire officials are charged not only with extinguishing fires, but with finding their causes.  Prompt determination of the fire's origin may be necessary to prevent its recurrence, such as through the detection of continuing dangers such as faulty wiring or a defective furnace.  Immediate investigation may also be necessary to preserve evidence from intentional or accidental destruction. . . .For these reasons, officials need no warrant to remain in a building for a reasonable time to investigate the cause of a blaze after it has been extinguished.

Id.

> As pointed out in Tyler, the court notes
>
> the circumstances of particular fires and the role of firemen and investigating officials will vary widely.  A fire in a single-family dwelling that clearly is extinguished at some identifiable time presents fewer complexities than those likely to attend a fire that spreads through a large apartment complex or that engulfs numerous buildings.  In the latter situations, it may be necessary for officials - - pursuing their duty both to extinguish the fire and to ascertain its origin - - to remain on the scene for an extended period of time repeatedly entering or re-entering the building or buildings, or portions thereof.  In determining what constitutes a "reasonable time to investigate," appropriate recognition must be given to the exigencies that confront officials serving under these conditions, as well as to individuals' reasonable expectations of privacy.

Id. at 510, n. 6.

The Supreme Court revisited the fire-suppression and investigation issue in Michigan v. Clifford, 464 U.S. 287, 292 (1984) finding that the constitutionality of warrantless and non-consensual entries onto fire-damaged premised normally turn on three factors: (1) whether there are legitimate privacy interests in the fire-damaged property that are protected by the Fourth Amendment; (2) whether exigent circumstances justify the government intrusion regardless of any reasonable expectations of privacy; and (3) whether the object of the search is to determine

the cause of the fire or to gather evidence of criminal activity. Clifford, 464 U.S. at 292. The court will examine each of the factors.

1. **Legitimate Privacy Interests**

   While "reasonable privacy expectations may remain in fire-damaged premises", these

   > privacy expectations will vary with the type of property, the amount of fire damage, the prior and continued use of the premises, and in some cases, the owner's efforts to secure it against intruders. Some fires may be so devastating that no reasonable privacy interests remain in the ash and ruins, regardless of the owner's subjective expectations. The test essentially is an objective one: whether "the expectation [is] one that society is prepared to recognize as 'reasonable'"
   > Katz v. United States, 389 U.S. 347, 361 (1967).

Clifford, 464 U.S. at 292.

In his Motion to Suppress defendant relies solely on the expectation of privacy element. Expectations of privacy are particularly strong in private residences and there are diminished privacy expectations in commercial premises. Clifford, 464 U.S. at 297, n.7. Compare Tyler, 436 U.S. at 511 (fire-damaged furniture store) with Clifford, 464 U.S. at 292 (fire-damaged private residence). Here, whatever privacy expectations defendant claims to have had are diminished by the fact that this property was commercial property not defendant's residence.

As an initial matter defendant has no standing to challenge the entry into the auction barn because defendant leased this building and it was used exclusively by Saint Clair Livestock Auctions.[2] Although defendant and two of his employees had keys to all three of the searched

---

[2] As pointed out in United States v. Sanchez, 943 F.2d 110, 113 n.1 (1st Cir. 1991), the use of the word "standing" is convenient but somewhat imprecise. The Supreme Court has indicated in Rakas v. Illinois, 439 U.S. 128 (1978), that matters of standing in the context of searches and seizures actually involve substantive Fourth Amendment law. See also Minnesota v. Carter, 525 U.S. 83, 119 S.Ct. 469, 472 (1998)("in determining whether a defendant is able to show a violation of his (and not someone else's) Fourth Amendment rights, the 'definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.'" quoting Rakas.) Standing is not to be analyzed apart from the merits, rather a defendant is required to prove a legitimate expectation of privacy as a prerequisite to challenge unlawful police conduct. Sanchez, 943 F.2d at 113 n.1.

areas of the buildings on the property, this, in itself, gives defendant no more of an expectation of privacy than that of any landlord.  Defendant has no objective expectation of privacy in this structure used exclusively by Saint Clair Livestock Auction that society would recognize as reasonable.  Katz, 389 U.S. at 361.  This is because Fourth Amendment rights may not be asserted vicariously.  Defendant has the burden of proof on the issue of his reasonable expectation of privacy.  United States v. Kiser, 948 F.2d 418, 423 (8th Cir. 1991), cert. denied, 11 S.Ct. 1666 (1992).  If a defendant cannot prove a sufficiently close connection to the object or place searched, he has no standing to claim the search was illegal.  United States v. Sanchez, 943 F.2d 110, 113 (1st Cir. 1991).  That is the situation with regard to the auction barn.

      The amount of damage to the property is significant.  When the first responders arrived, the auction barn was fully involved and the six fifth-wheel horse trailers had been broken into and liquid with the odor of flammable fluid had been splashed throughout two of them.  Each of the trailers contained a one-gallon container approximately two-thirds full of yellow liquid and three of the trailers showed evidence of small fires set in the living quarters.  The fires were clearly incendiary in nature especially since there were five separate points of origin in four separate structures.

      After the fires were extinguished, defendant made no effort to secure the burned out premises against intruders.  See Clifford, 464 U.S. at 292 and 296.  (Privacy expectations vary and in some cases the owner's efforts to secure it show that privacy expectations remain in fire-damaged premises).  Defendant refers to and relies on the fencing and locks as his security efforts, however it is the "reasonable efforts to secure [one's] one home *after* the blaze had been extinguished and the fire and police have left the scene" that is constitutionally significant. Clifford, 464 U.S. at 297.

As noted above, defendant has the burden of proof on the issue of his reasonable expectation of privacy. Kiser, 948 F.2d at 423. All the evidence seized was taken from a business during investigation by first responders and investigators called in for assistance. Here, defendant has not met his burden.

**2.      Exigent Circumstances**

"[I]t would defy reason to suppose that firemen must secure a warrant or consent before entering a burning structure to put out the blaze." Tyler, 436 U.S. at 509. Once in a building for the purpose of extinguishing the flames, the fire fighters may seize evidence of arson that is in plain view. Id., citing Coolidge v. New Hampshire, 403 U.S. 443, 465, 466 (1971). As noted above, fire officials are charged not only with extinguishing fires but finding their causes and thus they need no warrant to remain for a reasonable time to investigate the cause of the blaze after it has been put out. Clifford, 464 U.S. at 646-647.

The aftermath of a fire often presents exigencies that will not tolerate the delay necessary to obtain a warrant or to secure the owner's consent to inspect the fire damaged premises. Id. at 647. Determining the cause and origin of the fire serves a compelling public interest and thus the warrant requirement does not apply. Id. There could be an immediate threat that the blaze might rekindle and immediate investigation may be necessary to preserve evidence from intentional or accidental destruction. Id. at 647 n.4.

Here, investigators arrived at approximately 11:00 A.M. to assist the first responders in determining the cause and origin of the fires at defendant's property. The first responders did not relinquish the scene until the investigators arrived. The government makes the plausible argument that the investigation by the investigative agents and the dog, Chloe, was not separate from the efforts of the first responders but a united effort with them to determine the causes of ignition at each point of origin and also prevent re-ignition. Gov.'s Response to Def.'s Motion at

p.5. See Tyler, 436 U.S. at 511 (warrantless post-fire search did not invalidate resulting seizure of evidence, despite lack of exigent circumstances because it was a continuation of a valid search begun immediately after the fire.)

In the alternative, if the district court finds the gap in time too great between the extinguishing of the blaze at approximately 8:00 o'clock and the arrival of the investigators at 11:00 A.M. and would therefore require the identification of a separate exigency,[3] it is undisputed that the combustible fluid found in numerous locations as well as the multiple points of origin made further investigation necessary for public safety. The risk of re-ignition is clear and provides the required exigency. See Clifford, 464 U.S. at 293.

**3.      Object of the Search**

The third factor to be considered is "whether the object of the search is to determine the cause of the fire or to gather evidence of criminal activity." Clifford, 464 U.S. at 292. In Boettger, the Eighth Circuit found that "continuing danger was created by the apparent presence of explosive chemicals and destructive devices." Boettger, 71 F.3d at 1414. The court found this was a more complicated situation than a normal fire scene as is the situation in the present case. The Boettger court found that "examination of the chemicals present and their potential for further explosion was beyond the expertise of the first local and federal officials who arrived." Id.

Here, the first responders observed the windows of six trailers had been broken and flammable liquid splashed throughout two of them. They further observed that three of the

---

[3] However, the Eight Circuit found in United States v. Boettger, 71 F.3d 1410, 1414 (8th Cir. 1995) that both Clifford and Tyler recognize that there is no bright line test. 464 U.S. at 298 n.9. "The reasonableness of a search will depend on 'the circumstances of the particular [hazard] and generally involve *more than the lapse of time* or the number of entries and re-entries." Id., Boettger 71 F.3d at 1414. (emphasis added).

- 9 -

trailers had small fires set within the living quarters and each contained a one gallon plastic container two-thirds full of a yellow liquid. They therefore required the assistance of the Ignitable Liquid Detection Dog, Chloe, and her handler as well as two Special Agents/Certified Fire Investigators from ATF to determine the cause and origin of the fires. Other special fire investigators also assisted.

The parties Stipulation of Facts states that the items seized had only to do with the cause and origin of the fire:

> Officers and agents would testify that inside the building and residential areas of the trailers, they found, seized and photographed inflammable liquids and ignition devices, including the burned and unburned newspaper; that they found, photographed and seized a spot of blood on the exterior of one of the trailers, which was later "DNA matched" to defendant; that inside the building they found and photographed various electric panels, wiring and devices as well as propane tanks, lines, valves and devices which can sometimes be the source of non-incendiary fire; and that inside the building they found and seized several samples of carpet and business receipts alerted to by canine "Chloe," additionally seizing samples of carpet from underneath the receipts.

Stipulation at p. 4. Significantly, everyone who entered the auction barn, offices and trailers did so to ascertain the cause and origin of the fire. See Boettger, 71 F.3d at 1415 (each official who entered "did so to ascertain the cause of the explosion and detect other devices which could explode.")

Clearly the circumstances faced by the first responders required that they call for experienced fire investigators. They did not exceed the permitted scope of the search.

## CONCLUSION

Defendant had no expectation of privacy in his business premises after the fire. There were exigent circumstances that justified the search. The investigators did not exceed the scope of the search but only seized items dealing with the cause and origin of the fire. The three

Clifford factors have been satisfied and thus the warrantless, non-consensual entry onto the property and the seizure of evidence were constitutional, lawful and proper.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence be **DENIED**. [Doc. 21]

The parties are advised that they have fourteen (14) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Trial in this case has been set on **August 27, 2012** at **9:30 A.M.** before the Honorable Henry E. Autrey.

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this   11th    day of  July, 2012.